| | | |
|---|---|---|
| BLAZE BETTS, | ) | |
| | ) | |
| Plaintiff, | ) | Jury Demanded |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| SENIOR CARE ASSOCIATES, LLC, d/b/a | ) | |
| MORNING POINTE SENIOR LIVING, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff sues Defendant and shows unto the Court as follows:

### I. JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked by Plaintiff pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1331, to secure protection and redress for the deprivation of rights granted by Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), providing for legal and other relief against pregnancy discrimination in employment.

2. The actions giving rise to this Complaint occurred within the boundaries of the Eastern District of Tennessee, and venue is proper in this district pursuant to 28 U.S.C. § 1391.

### II. NATURE OF PROCEEDING

3. This is a proceeding for back pay and benefits due to Plaintiff; for injunctive relief requiring Defendant to cease its discriminatory practices and to promote Plaintiff to the next available Executive Director position; for compensatory damages; punitive damages; prejudgment interest and attorney fees; and for additional damages as may be necessary to effectuate the purposes of Title VII.

### III.  THE PARTIES

4.      While employed by Defendant, Plaintiff was a resident of Catoosa County, Georgia.

5.      Defendant Senior Care Associates, LLC is a Tennessee limited liability company, with its headquarters located in Hamilton County, Tennessee.

6.      Defendant conducts business under the name "Morning Pointe Senior Living."

7.      Defendant employs more than 500 employees at multiple Morning Pointe facilities located across Tennessee, Alabama, Georgia, Kentucky, and Indiana.

8.      Pursuant to 42 U.S.C. § 2000e(b), Defendant is an "employer" within the meaning of, and is subject to, the provisions of Title VII.

### IV.  RELEVANT FACTUAL ALLEGATIONS

9.      Plaintiff was hired by Defendant (hereinafter referred to as "Morning Pointe") on May 9, 2024, as an Executive Director in Training.

10.      Morning Pointe's Executive Director in Training program (hereinafter "EDIT Program") trains individuals to serve in the role of Executive Director at one of Morning Pointe's facilities.  Upon completion of the EDIT Program, the individual is normally promoted to the role of Executive Director at one of Morning Pointe's facilities.

11.      During her first year in the EDIT Program, Rob Pollard, Senior Vice President of Operations, had overall responsibility for the EDIT Program.

12.      Plaintiff spent her first six months training in the Chattanooga area at two different facilities under the supervision of Abby Medley, Regional Vice President of the Appalachian Region, which covers approximately 15 facilities.

2

13.     In January 2025, Plaintiff was assigned to Morning Pointe's facility in Greeneville, Tennessee, to serve as Interim Executive Director.  In that role, she reported directly to Josh Lowe, Regional Vice President over the Smoky Region, which covers approximately 10 facilities.

14.     Plaintiff worked in Greeneville for five months.  During this time, she functioned as *de facto* Executive Director because the position was vacant.

15.     Greeneville's metrics were not great when Plaintiff arrived.  However, by April 2025, Greeneville's metrics scorecard had improved enough to advance it from a "yellow" to "green" category.

16.     During her first three months at Greeneville, Mr. Lowe gave mainly positive feedback to Plaintiff about her performance and indicated on several occasions that she would be promoted to the Executive Director role at the facility.

17.     On March 10, 2025, Plaintiff disclosed her pregnancy to Mr. Lowe.  Seven days later, he informed Plaintiff that she was "not a good fit" for the Executive Director position, although he never explained his abrupt change.  Despite allegedly not being a "good fit," Plaintiff continued in her role at Greeneville for two more months.

18.     Plaintiff was eventually reassigned to Chattanooga in mid-May 2025 to work under the direction of Michelle Barker, Executive Director of Morning Pointe's Chattanooga assisted living facility.  With this reassignment, Abby Medley once again became Plaintiff's EDIT Program training supervisor.

19.     At Chattanooga, like before, Plaintiff's work performance was satisfactory. However, Ms. Medley provided no specific guidance or plan for Plaintiff to be promoted to an Executive Director role, despite Plaintiff's periodic requests for feedback and promotional

3

strategy. Eventually, at Plaintiff's request, a meeting was scheduled for July 1, 2025, to supposedly discuss her career advancement plan.

20. The July 1st meeting was chaired by Rob Pollard, to whom both Mr. Lowe and Ms. Medley directly reported. At the time, he was responsible for the entire EDIT program and ultimately determined whether an EDIT would be promoted to an Executive Director position.

21. At the beginning of the meeting, without any prompting, Mr. Pollard stated to Plaintiff, "I want you to know that you're not being punished for your situation." When he spoke the words "your situation," he pointed to Plaintiff's pregnant belly. Mr. Pollard then mentioned, "You know, we are a very conservative company." (Plaintiff is not married to her baby's father.)

22. When Plaintiff requested a promotional timeframe so she could start planning for her baby, Mr. Pollard acknowledged that she had been in the EDIT program the longest of all trainees. He then stated, "You could get a call anytime" to be promoted to Executive Director. Other than a vague reference to the need to "work on your maturity," Mr. Pollard did not provide any critical feedback. He simply stated, "Keep doing what you are doing."

23. Notably, since she began the EDIT Program training, Plaintiff had not received any written assessment (formal or otherwise) as to her training progress, including but not limited to, performance reviews, percentage of training course completion, timetable for training completion, goals to achieve, or expectations to satisfy.

24. In mid-August 2025, Plaintiff learned that fellow EDIT Bailey Hufstetler (male) was promoted to the Executive Director position at Morning Pointe's Collegedale facility. Mr. Hufstetler had only been in the EDIT Program for four months.

25. On August 18, 2025, Plaintiff sent a text to Ms. Medley, which stated, "Hi, I was just informed Bailey was promoted. I'm a little confused as I have been in this program for 14

4

months with no clear direction or plan for me. **I know I was told by Rob that I wasn't being "punished" for being pregnant, but this certainly feels like discrimination to me.** I am happy to discuss next steps. Thanks!"

26.     Ms. Medley responded to Plaintiff's text with the explanation that the Collegedale position "is not the right fit for you." Ms. Medley first stated that Collegedale is a memory care unit, and she "heard" that Plaintiff did not want to work at a memory care unit. This reason is false. Plaintiff told numerous people, including Ms. Medley, that she **did** want to work in a memory care unit.

27.     Ms. Medley's second reason was also bogus. She claimed that Mr. Hufstetler "has been in the industry a lot longer than you." This is false. Mr. Hufstetler had no experience working in the senior care industry prior to April 2025, when he started the EDIT Program. Unlike Mr. Hufstetler, Plaintiff has continually worked in the senior care industry full-time for the past three years, and she has worked on a part-time basis in the industry since 2013. Thus, she had far more experience in the senior care industry than Mr. Hufstetler.

28.     On August 27, 2025, Ms. Medley met with Plaintiff to allegedly discuss her career progression. In this meeting, Ms. Medley inquired about Plaintiff's due date. Ms. Medley then, unprompted, suggested that Plaintiff could resign without fear of Morning Pointe seeking reimbursement of her training costs. Plaintiff made clear that she did not want to resign; she stated that it was her goal to be promoted to the role of Executive Director. Ms. Medley's only criticism was that Plaintiff "lacked maturity," but she did not elaborate further.

29.     Since being transferred back to the Chattanooga area in mid-May 2025, Plaintiff had not been given any meaningful assignments or Executive Director specific training. Nor had she been given any clear plan for career advancement. Instead, she was asked to perform menial,

busy work tasks. In some instances, she had to find her own daily tasks to perform because there was nothing for her to do.

30. The two Executive Directors under whom she worked did not have any plan or guideline for supposedly "readying" Plaintiff for promotion to an Executive Director role. When Morning Pointe transferred Plaintiff to its Rossville, Georgia, facility (where Plaintiff began her EDIT Program training) in mid-August 2025, Executive Director Alisha Landes stated that she really did not know what to do with her. Ms. Landes admitted that she had no specific direction from Ms. Medley as to how to train or "improve" Plaintiff. In essence, after learning that Plaintiff was pregnant, Morning Pointe basically abandoned her active training and stopped all efforts to promote her to an Executive Director role.

31. On September 12, 2025, Plaintiff learned that the Executive Director position at Powell was vacant. She texted Ms. Medley and asked if she could be considered for the Powell Executive Director position. Ms. Medley responded that the Powell position "will not be an option" because "we still believe that you are not ready to take on a community at this time." Ms. Medley added, "Moving forward I will let you know if and when we feel you are ready."

32. On September 17, 2025, Plaintiff submitted her completed paperwork for FMLA leave for her pregnancy, and her pregnancy leave began on or about September 18, 2025.

33. Despite repeated requests, prior to the commencement of pregnancy leave, Morning Pointe never provided any written guidance as to specific areas of improvement that Plaintiff needed to be ready for promotion to an Executive Director position.

34. Prior to the commencement of pregnancy leave, Plaintiff never received a disciplinary warning or any performance improvement plan.

6

35.     Prior to the commencement of pregnancy leave, Plaintiff never received a written performance evaluation or any written progress report showing what training items she lacked or in what areas of training she was not proficient.

36.     Plaintiff gave birth to her daughter on November 17, 2025.

37.     At all times relevant herein, Morning Pointe's decision-makers – including but not limited to, Rob Pollard, Josh Lowe, and Abby Medley – were aware that it is illegal for an employer to discriminate against an employee because of her pregnancy or because she engaged in Title VII protected complaint.  Despite their knowledge of the law, Morning Pointe's decision-makers acted, at a minimum, in reckless disregard of Plaintiff's Title VII rights, or at worst, with malicious intent.

## V.  LEGAL CLAIMS

Count 1: Discriminatory Failure to Promote – Greeneville

38.     Plaintiff was qualified to perform the Executive Director position at Greeneville.  By refusing to promote Plaintiff to the Greeneville Executive Director position because of her pregnancy, Morning Pointe unlawfully discriminated against Plaintiff in violation of Title VII.

Count 2: Discriminatory Failure to Promote – Collegedale

39.     Plaintiff was qualified to perform the Executive Director position at Collegedale.  By refusing to promote Plaintiff to the Collegedale Executive Director position because of her pregnancy, Morning Pointe unlawfully discriminated against Plaintiff in violation of Title VII.

Count 3: Discriminatory Failure to Promote – Powell

40.     Plaintiff was qualified to perform the Executive Director position at Powell.  By refusing to promote Plaintiff to the Powell Executive Director position because of her pregnancy, Morning Pointe unlawfully discriminated against Plaintiff in violation of Title VII.

7

<u>Count 4: Retaliatory Failure to Promote – Powell</u>

41.     Plaintiff engaged in Title VII protected activity when she texted her supervisor Abby Medley on August 18, 2025, that she felt that she was being punished for being pregnant in not receiving promotional opportunities.

42.     Less than one month later, when Plaintiff requested promotion to the Executive Director position at Powell, Ms. Medley denied the promotion request, despite Plaintiff being qualified to perform the role.

43.     By refusing to promote Plaintiff to the Powell Executive Director position because of her protected activity, Morning Pointe unlawfully retaliated against Plaintiff in violation of Title VII.

## VI.  ADMINISTRATIVE EXHAUSTION

44.     On November 25, 2025, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), which was assigned Charge Number 494-2026-00794.  On May 28, 2026, the EEOC issued Plaintiff a Notice of Right to Sue.  Plaintiff filed this Complaint within 90 days of the Notice of Right to Sue.

## VII.  DAMAGES

45.     As a result of the wrongful actions of Defendant as described above, Plaintiff has suffered both financially and emotionally.  In particular, Plaintiff has lost and will continue to lose wages and valuable employee benefits.  In addition to the actual and financial loss Plaintiff has sustained, she has suffered emotional grief because of Defendant's illegal actions.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays as follows:

a.      That the Court issue and serve process on Defendant and require Defendant to answer within the time prescribed by law;

b.    That Plaintiff be awarded judgment for damages for lost wages and employee benefits which she has lost from the date of Defendant's discriminatory actions through the date of trial;

c.    That the Court issue an injunction requiring Defendant to promote Plaintiff to the next available Executive Director position, or in the alternative, to award front pay in lieu thereof;

d.    That Plaintiff be awarded additional compensatory damages, including damages for emotional grief, humiliation, and embarrassment;

e.    That Plaintiff be awarded punitive damages pursuant to 42 U.S.C. §1981a;

f.    That Plaintiff be awarded attorney fees, prejudgment interest, costs of this action, litigation expenses, and such other relief as the Court deems proper to effectuate the remedial purposes of Title VII; and

g.    Plaintiff demands a jury to try all claims and issues triable by a jury.

**MIKEL & HAMILL PLLC**

By:    s/ *Doug S. Hamill*
Doug S. Hamill, BPR No. 22825
Attorney for Plaintiff
620 Lindsay Street, Suite 200
Chattanooga, TN 37403
(423) 541-5400
dhamill@mhemploymentlaw.com

9